[Civ. No. 4865. Second Appellate District, Division Two.—December 19, 1927.]

CLIFFORD TILLOTSON et al., Appellants, v. MARY E. FINDLEY, Individually and as Executrix, etc., Respondent.

I. Henry Harris for Appellants.

Peyton H. Moore for Respondent.

STEPHENS, J., *pro tem.*—Clifford Tillotson and his mother, Ada Tillotson, plaintiffs and appellants herein, brought this suit in May, 1922, to compel Mary E. Findley, executrix of the estate of Mathew W. Findley, deceased, to execute to them an assignment of two certificates of stock each representing 7½ shares in the Atlas Fire Brick Company, a California corporation. The trial court denied any relief to plaintiffs and ordered judgment for defendant for her costs. Most of the facts are u. controverted and may be fairly stated as follows:

M. I. Powers, N. B. Harris, and Mathew W. Findley organized the Atlas Fire Brick Company with an authorized capital of $25,000, divided into 250 shares of a par value of $100 each. Powers' interest was 125 shares, Harris and Findley 62½ shares each. In consideration therefor Powers paid $12,500 to the corporation, and Harris and Findley delivered and sold certain secret formulas for the manufacture of brick to the company. The amount of cash put up by Powers was to be repaid to him out of the first dividends, before any other holder of stock should enjoy a dividend. The corporation began to function in February of 1918. All issued stock was in Powers' name escrowed by order of the corporation commissioner. A condition of

the escrow was that "the holders of the shares evidenced thereby shall not sell or offer for sale, or otherwise transfer, or agree to sell or transfer, such shares, without the written consent of said Commissioner shall have been first obtained in writing so to do." This permit is dated July 18, 1918.

Mathew W. Findley had known each of the plaintiffs, the appellants herein, for a long time, and had had close business and friendly relations with each of them. When the negotiations for the incorporation of the Atlas Fire Brick Company were practically completed Findley sought to induce (Christmas Day, 1917, and during January, 1918), and did induce Clifford Tillotson to quit a position paying $175 per month, with fair prospects for betterment, and accept a position with the Atlas Company paying him $100 per month. Tillotson accepted the proposition offered by Findley on or about February 1, 1918, and actually entered the services of the Atlas Company about May of the same year. · Later, commissions on sales were added and raises to $150 and $200 a month were given him. As an additional inducement to secure the services of Clifford Tillotson to the Atlas Company, Findley agreed to give him twenty-five per cent of his interest in the company stock, this being conditional that one-half of this twenty-five per cent should belong to Ada Tillotson and apply on or cancel an antecedent debt from Findley to her. This was accepted by both the Tillotsons. Later, in May or June, 1918, this agreement was changed so that the Tillotsons were to receive 7½ shares each on the same consideration. When the stock was issued to Findley he directed it to be divided into separate certificates, one of 42½ shares, two of 7½ shares and one of 5 shares. Powers testified: "He wanted the services of Mr. Tillotson on the plant and he wanted to give him—he told me he wanted to have those 7½ shares, and 7½ to Mrs. Tillotson and 5 to Stewart [a son of Findley's]. That was the reason he wanted them in that form."

On February 28, 1918, Findley and Harris entered into a pooling agreement whereby the stock held by them was to be voted as a whole or not at all.

On the 27th of December, 1918, an agreement was entered into between Atlas Fire Brick Company and the Tillotsons as follows:

"This agreement, made and entered into this 27th day of December, A. D. 1918, by and between Atlas Fire Brick Company, a corporation, and Clifford Tillotson and Mrs. A. Tillotson, his mother, said *Clifford Tillotson and his mother being assignees of stock of M. W. Findley in said company, said stock being held in escrow according to the terms and conditions of permit No. 5454,* issued by the state corporation department of California. . . . [Then follows a recital that the incorporators have entered into an agreement against divulging secret formulas and a recital that the Tillotsons, being assignees of some of the original stock, are so bound.]

"In witness thereof parties hereunto have set their hands the day and year first above written.

"ATLAS FIRE BRICK COMPANY,

"(Signed) M. W. FINDLEY, Pres.

"(Signed) NICK B. HARRIS, Sec.

"Seal.

"CLIFFORD TILLOTSON

"MRS. A. TILLOTSON."

The company did not make money immediately, but it continued to go, and some time prior to trial declared at least one dividend. It borrowed about $21,000 from Powers, who did not care to advance more money, and in order that the company should be in funds, on February 20, 1920, Findley and Harris each paid into the corporation $6,250, par value of the stock which they received, whereupon the escrow was closed and the stock released. Up to this time no written consent to transfer of stock had been given by the corporation commissioner. There is no evidence that either of the Tillotsons was ever consulted or ever agreed to the payment of the $6,250 to the corporation by Findley. The full 125 shares of stock in the divided certificates were issued to Findley, who explained the matter to Clifford Tillotson for himself and Ada Tillotson that this was desirable under the pooling agreement, and Clifford Tillotson then assented thereto. The latter continued to work for the company, receiving salary until Findley died, on or about January 15, 1922, and the pooling agreement remained in effect to that date. No stock was ever issued to either of the Tillotsons, and claim for

same was rejected by the executrix of the estate of M. W. Findley.

The testimony of Clifford Tillotson assenting to the request of Findley that the stock should remain in his name while the pooling agreement was in effect is as follows:

"Mr. Findley never made out that stock to me directly. He made it out in what he explained to me to be the necessary forms to comply with this agreement he had with Mr. Nick Harris, pooling agreement. That was in—that was at the time, or just a few days—well, I will say at the time that the stock was released by the corporation commissioner. I could not give you the date on there; but I know that near the time the stock was released I was interested to know when my stock was coming, if I would not receive it, and he told me that there was a paper in Mr. Moote's office that had been written up but never signed up, we would go up there and have that executed; but he says, 'After this, stock, you know, will have to be voted by myself and Nick Harris to conform to our pooling agreement.' He asked me if I saw any reason or had any objection to the way of handling the matter. I saw none, so I told him—

"Mr. Harris: Do you recall anything else that was said about the stock? A. There was no further conversation at that time as the matter was made clear to me. Mr. Findley never delivered that stock to me. I never asked him to.

"Q. Did he ever tell you when he would deliver it to you? A. That the stock would be held so that the vote of the stock would be in his name, that proxies would be of no value only from time to time and if the stock was issued to other than his name or that of Nick Harris, the one in whose name the stock stood would naturally have the voting power of the stock; that the stock for that reason would have to stand in his name so long as the pooling agreement existed between him and Nick Harris. However, that he was having a paper drawn up by Mr. Moote, an attorney, which would show my interest and my mother's interest and right and title to that stock and the benefits of that stock; but that as long as this pooling agreement existed, the stock would remain on the books of the company in his or Mr. Harris' name, had to be one of the two; but that if the pooling agreement was cancelled, why, quite

naturally the stock would come to me and my mother. The pooling agreement was never cancelled, to my knowledge, during his lifetime. It was cancelled after his death.''

Under the facts as here stated it would seem to us that the stock was actually held by Findley for the Tillotsons under a complete understanding between the parties and upon a valuable consideration.

Counsel for respondent in his brief complains that ''counsel for the appellants has failed to segregate the points upon which he relies to reverse the judgment appealed from in this action, and therefore it is somewhat difficult to answer said arguments specifically.'' But counsel for respondent should appreciate that his antagonist is faced with the difficulty of attacking a judgment which does not reveal, in findings, conclusions or judgment, the point or points upon which the trial court found against him.

The findings are simply that all allegations of the complaint which refer to the alleged agreement between the Tillotsons and Findley are untrue. Appellant attacks the findings on the ground that they are not supported by the evidence, and this necessarily presents a negative problem. To convert it into an affirmative problem we shall have to consider the narrative of facts from the undisputed evidence in the case. The problem may be stated as follows: Does the evidence which stands unattacked and as to which there is no conflicting evidence entitle plaintiff to any relief under the pleadings? The evidence is here under a bill of exceptions, and respondent has in her brief set out the points upon which she relies in support of the trial court's findings and judgment based thereon. With the above question in mind we shall recite defendant's points and comment thereon:

(1) That under the evidence introduced ''the stock was never released from escrow upon the basis in which it was originally placed therein, and was only released upon a reorganization of the company being effected and upon Findley and associates paying for said stock in cash.''

■ It may be doubted that the payment of money by Findley and Harris equal to the par value of the stock they had subscribed for was in effect a reorganization of the company. It must be remembered that the formula given remained the property of the company, and the sole

testimony on the subject is that it had taken more money to run the business than was anticipated; that Powers, having paid in more than his share in money loaned, did not care to furnish any more money; and that the difficulty was met by Harris and Findley paying in the par value of their stock and having the same released from escrow. But if the Tillotsons had any interest in stock that stood in Findley's name, such an arrangement could not of itself divest them of such interest. (Civ. Code, sec. 2280; *Hellman* v. *McWilliams*, 70 Cal. 453 [11 Pac. 659].)

(2) "The record shows that Findley did not declare that he held said stock in trust for Tillotson *in praesenti* but merely promised a delivery of stock *in futuro* upon the happening of certain stipulated conditions." It seems to us that the various conversations, acts and admissions of Findley leave no uncertainty as to the fact that it was the intention and belief of all of the parties concerned that the two Tillotsons owned 7½ shares each of the stock escrowed in Findley's name, subject not to the whims or caprice or option of Findley or anybody else, but only to the fixed terms of the escrow. This is a delivery *in praesenti,* unless there is some legal inhibition to the delivery. We think the only possible conclusion from the evidence is that the stock was given unconditionally by Findley for the desired services of Clifford Tillotson to the company and the satisfaction of an indebtedness owing to Ada Tillotson, both of which Findley got upon the assent of the offer made to the Tillotsons by Findley. Therefore there was no element of future delivery present, unless a legal inhibition intervened to prevent the consummation of Findley's intention.

(3) The claim that "appellant fails to recognize the distinction between a delivery in escrow to be made upon conditions which may never be fulfilled and an actuality" is sufficiently treated under the last two paragraphs.

Respondent claims that plaintiffs have mistaken their remedy in that they should have proceeded in an action in damages for breach of covenant to convey personal property. Counsel correctly states the law that "in general a court of equitable jurisdiction will not decree the transfer of personal property which has a market value and no special or unique value." But the record reveals that

this company, at the time this case was tried, was a struggling corporation with its success or its degree of success or failure as yet unproved. The facts in the case do not bring it under the principle stated in section 3387 of the Civil Code.

█ It was unquestionably the intention of Findley in splitting the stock into separate certificates to hold the same for the Tillotsons until it was freed from the escrow conditions and the pooling agreement and every element of a trust was present (*Souza* v. *First Nat. Bank*, 36 Cal. App. 388 [172 Pac. 175]), but this action violated the provision of the escrow conditions prohibiting assignment of any part of said stock, and failed of being a trust because thereof. However, upon the release of the stock from escrow Findley reavowed, reacknowledged and reasserted to the Tillotsons that he held their stock for them. Whereupon the Tillotsons consented to its remaining in trust with Findley (and here the close relations of the Tillotsons and Findley should be remembered) so as to preserve the pooling agreement.

The case was tried upon the theory that the evidence was not sufficient to constitute a trust. The allegations of the complaint are that a trust was formed because of the acceptance of the offer from Findley to Clifford Tillotson and Tillotson's engaging in the work mentioned in the offer, and at the time the stock was issued in separate certificates under the escrow. The undisputed testimony establishes this allegation, and the trust only fails because of the provision in the escrow against alienation, placed there by order of the corporation commissioner. Where the testimony is all one way on the ultimate fact, to wit, Was a trust existent at the time of the death of Findley? courts ought to go as far as possible under the pleadings, to the end that the judgment may conform to the true determination of the issue. █ It is the general rule that the uncontradicted and unimpeached testimony of a witness tending to establish an issuable fact in the case may not be arbitrarily disregarded by the trial court; that, to the contrary, such testimony must be accepted as proof of the fact which it is offered to establish, unless it can be said that such testimony is so inherently incredible and

improbable as to amount to no evidence at all. (10 Cal. Jur., p. 1143, sec. 362 and cases cited.)

We find in paragraph I of the answer the following: "That the defendants and each of them deny that on or about the month of February, 1920, *or at any other time,* that Mathew W. Findley received from the Atlas Fire Brick Company, a corporation organized under the laws of the state of California, as trustee for Clifford Tillotson, one of the plaintiffs in this action, two or any certificates representing seven and one-half shares of the capital stock of the Atlas Fire Brick Company." And in paragraph III the following: " . . . they [defendants] and each of them deny that the said Mathew W. Findley promised or agreed prior or at the time of the issuance of said certificates, *or at any other time,* that he would take the same [shares of stock] in trust or for the benefit of the said plaintiff, Clifford Tillotson, or that he would endorse the same to the plaintiff, Tillotson, or his assignee *upon demand or otherwise, or at all."*

Considering the fact that in the face of these denials Clifford Tillotson testified in full without objection being interposed as to the time that Findley reiterated his statements in regard to his possession of stock belonging to the Tillotsons, subsequent to release of the stock from escrow, it is apparent to us that the issue as to whether or not a trust of the stock existed at the time of Findley's death was before the court. "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits . . . " (Sec. 469, Code Civ. Proc.; *Carter* v. *Baldwin,* 95 Cal. 475 [30 Pac. 595]; *Antonelle* v. *Lumber Co.,* 140 Cal. 309, 320 [73 Pac. 966]; *Stockton etc. Works* v. *Glens Falls Ins. Co.,* 121 Cal. 167, 171–173 [53 Pac. 573].) Since the testimony is all one way, and there is no inherent improbability in it, we conclude that the evidence does not support the findings of fact and that therefore the judgment based thereon must fall.

The judgment is reversed.

Craig, Acting P. J., and Thompson, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 16, 1928.

All the Justices concurred.